IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF
AN APPLE IPHONE, ASSIGNED **ATF
ITEM: 000068**.

Case No. 3:21-MJ-00053-MMS


Feb 09 2021

## **AFFIDAVIT IN SUPPORT OF AN**
## **APPLICATION UNDER RULE 41 FOR A**
## **WARRANT TO SEARCH AND SEIZE**

**I,** R. Allen Adair, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND DETECTIVE BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of an **Apple iPhone, seized and assigned ATF Item: 000068** and the seizure of evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §924(c)(1)(A), Title 21 U.S.C. §841(a)(1), and State of Alaska weapons offenses.

2. I am a Police Officer employed by the Municipality of Anchorage Police Department and am presently a Commissioned Police Officer in the State of Alaska. Between May 2007 and April 2019, I was assigned to the Anchorage Police Department's (APD) Vice Unit. My assignment with the Vice Unit focused on investigations related to prostitution, human trafficking and trafficking of controlled substances.

3. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. In April 2019, I was assigned to a task force position with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. My duties continue to focus on controlled substance and firearm related crimes impacting the Anchorage Community.


4. I have more than twenty-five years of combined law enforcement experience. I was an explosive and drug detector dog handler with the United States Air Force from June 1991 to August 1996. In August 1996, I was credentialed as a Special Agent with the Air Force Office of Special Investigations. In August 2004, I left active duty with the military and was employed with the Anchorage Police Department as an Officer. I retired from the Air Force Office of Special Investigations in May 2011.

5. I have graduated from three basic law enforcement academies. The first was the United States Air Force Police Academy in December, 1991. The second was the Air Force Office of Special Investigations Academy in November 1996 and the third was the APD Academy in January of 2005.

6. During my tenure as a drug detector dog handler, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. This training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances throughout the continental United States and military bases abroad.

7. I attended and graduated from a six month special investigations academy operated by the Department of Defense. While attending this academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. This training predominately focused on the investigation of crimes involving the use, possession, manufacture and trafficking of controlled substances and the means by which to infiltrate and/or identify individuals and organizations involved in the use, possession, manufacture and trafficking of controlled substances.

8. I attended and graduated from a five month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's academy, and subsequent to graduation from APD's academy, I received training and instruction from several APD field training officers.



This training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

9. The majority of my police experience has been as a Special Agent assigned to various Joint Drug Enforcement Teams in Texas, California, and Alaska, followed by my tenure with APD's Vice Unit. My duties include watching for illegal activities, interviewing witnesses, victims and suspects, developing probable cause for cases, examining crime scenes in order to develop evidence to substantiate or disprove the allegation being investigated, handling and processing various types of evidence, utilizing human sources of information to resolve drug and other criminal related investigations, and assembling cases for possible prosecution by Federal, State, Municipal and Military Judicial Offices. In my law enforcement career, I have conducted hundreds of drug related investigations, involving the use, possession, manufacture, and trafficking of marijuana, lysergic acid diethylamide (LSD) cocaine hydrochloride, cocaine base (crack), heroin, ecstasy (MDMA), psilocybin mushrooms, methamphetamine, controlled prescription medication While conducting these investigations, I have interviewed several hundred people, involved either directly or indirectly with the crimes being investigated. I have also served or assisted in serving several drug related search warrants resulting in the seizure of the above mentioned drugs as well as firearms, ammunition, packaging materials, assorted concealment containers, cutting agents, digital and beam scales, cellular telephones, surveillance systems, marijuana grow operations, methamphetamine laboratories, cameras, body armor, memory cards, computers and related equipment, various electronic equipment purchased with illicit proceeds, documents, money, precious metals, gems, stolen property, address books, and assorted paraphernalia utilized to ingest controlled substances.

10. Based on my training and experience, I know people involved in the use, possession, manufacture, and/or drug trafficking of controlled substances commonly possess and use cellular telephones, standard telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks



attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

11. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

12. It is common for members of drug trafficking organizations to maintain telephonic/text message/messenger communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory.

13. It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name. Members of a drug trafficking organizations, to thwart law enforcement detection of their illicit drug trafficking activities, often use a different subscriber name and/or telephone number. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Because several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text-messaging history or within the contacts section of the cellular telephone.



14. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained in the memory of cellular telephone devices. Devices such as smart cellular telephones often imprint each photo with the GPS coordinates where such photos are taken. Thus, it is possible to discern the location of stash houses and other evidence by analyzing a digital photo.

15. Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

16. I received an associate in applied science, criminal justice degree from the Community College of the Air Force in 2004. I have attended the following courses to supplement training I received while attending the previously mentioned law enforcement academies:

    (i)     Department of Justice Operation Jetway Course, July 2018
    (ii)    DEA Social Media for Investigation Course, April 2018
    (iii)   FLETC Single Officer Response to an Active Threat, June 2018
    (iv)    DEA Social Media for Investigation Course, July 2014
    (v)     DEA Narcotic Management and Leadership Course, October 2012
    (vi)    DEA Prescription Drug Diversion Investigations Course, August 2012
    (vii)   DEA Drug Interdiction Course, September 2011
    (viii)  Investigating Drug Trafficking Organizations Course, August 2011
    (ix)    DEA Basic Drug Investigations Course, August 2010
    (x)     Mid-Level Narcotic Investigation Course, June 2010
    (xi)    DEA Indoor Marijuana Cultivation Investigations Course, July 2008
    (xii)   International Money Laundering Investigations, July 2008
    (xiii)  National Center for Missing and Exploited Children, Protecting Victims of Child Prostitution, January 2008
    (xiv)   DEA Controlled Substance Concealment Course, January 2008
    (xv)    Anchorage Police Department Crime Scene Processing Course, November 2004
    (xvi)   Anchorage Police Department Patrol Officer Academy, August 2004
    (xvii)  DoD Polygraph Institute Credibility Assessment through Linguistic Analysis, April 2002
    (xviii) Heinz Laboratories National Clandestine Drug Labs Course, January 2001



(xix)    AFOSI Protective Service Operation Course, August 2000

(xx)    USMC Urban/Rural Sniper/Counter-Sniper Training, January 2000

(xxi)    AFOSI Counterintelligence and Force Protection Operations Course, November 1999

(xxii)    AFOSI Evidence Custodian Training Course, May 1999

(xxiii)    Practical Homicide Investigation Course, February 1999

(xxiv)    Advanced Reid Technique of Interviewing and Interrogation, July 1998

(xxv)    AFOSI Advanced Special Investigators Course, July 1998

(xxvi)    AFOSI Forensics Course, October 1997

(xxvii)    AFOSI Special Investigators Course, December 1996

(xxviii)    Reid Technique of Interviewing and Interrogation, October 1996

(xxix)    Investigative Skills for Street Gangs, March 1996

(xxx)    Texas A & M Investigative Skills Course, November 1995

(xxxi)    USAF Explosive and Drug Detector Dog Handler Course, March 1992

(xxxii)    USAF Patrol Dog Handler Course, October 1991

(xxxiii)    USAF Law Enforcement Specialist Course, September 1991

## **TECHNICAL TERMS**

17. Based on my training, and experience, I know cellular telephones and other electronic devices often have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

18. Based on my training and experience, I use the above technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending,


receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications



that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  Computer: a computer as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between


devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20.  There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active


file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic



evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## LOCATION AND DEVICE ASSOCIATED WITH THIS REQUEST

24.    The cellular telephone referenced in this Affidavit is described as an **Apple iPhone, seized and assigned ATF Item: 000068.** This item is currently located within ATF's Evidence Vault, located at 222 W. 7th Street, Anchorage, Alaska.

## LIMITED NATURE OF AFFIDAVIT

25.    I have participated in the investigation of the offenses set forth above. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from local law enforcement officers and information obtained from the analysis of


reports.  All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.  I have not set forth each and every fact learned during the course of this investigation.  I have set forth only those facts which establish the foundation for probable cause.

**PROBABLE CAUSE**

26.      At 7:20 p.m., December 8th, 2020, Anchorage Police Department (APD) Officers were dispatched to several gunshots heard in the vicinity of W. 36th Avenue and Iowa Street.  (APD Case: 20-38606)  Multiple citizens called Dispatch regarding the shooting.  Officers arrived and located (9) 10mm expended shell casings in the roadway outside 3409 Northwood Drive.  3409 Northwood Drive is a multi-unit apartment complex occupied by at least one family.  On December 13th, 2020, I reviewed a video recording of the December 8th shooting incident.  Jaheim James RANDOLPH sent the video recording to his associate, Kyin Andre SUMPTER-BOYD.  RANDOLPH authored the video recording and he is heard verbally identifying "3409" and standing in the middle of the roadway at Northwood Drive, south of 3409 Northwood Drive.  Based on the video recording, RANDOLPH appears to be alone during the incident.  RANDOLPH is observed firing 9-10 rounds at 3409 Northwood Drive before fleeing south towards W. 36th Avenue.  The firearm RANDOLPH utilized to shoot 3409 Northwood Drive is a pistol with what appears to be a (30) round extended magazine.  RANDOLPH posted a social medial video recording of himself at the intersection of Northwood Drive and W. 36th Avenue where he boasts about "literally leaving their block" as he pans down to the interior of his jacket where the firearm is concealed.  Within an hour of the RANDOLPH's shooting, he is observed posting another social media video recording wherein he says, "I don't even keep the score, but if I did I'd say it's 6-0".  RANDOLPH's voice is clearly heard in the video recording as he records a Glock pistol with extended magazine laying on a bed in a residence.

27.      On December 9th, 2020, another shooting incident occurred outside 3409 Northwood Drive and across the street at 3500 Northwood Drive.  RANDOLPH posted a social media video


from within his residence, located at 3803 Iowa Drive. RANDOLPH speaks about the shooting and states, "Yo these niggas just slid up on my crib. Maybe like ten shots, but they ain't hit nothing. It wasn't like close, close." He goes onto say the shooters think "they gangster, but I shot at they shit." Further reviews of RANDOLPH's social media posts indicate he is engaged in sales of illicit prescription medication and heroin. Photographs of the prescription medication, accompanied by the prices he lists indicate RANDOLPH is engaged in the sale of illicit tablets suspected to be laced with fentanyl currently being sold in Anchorage.

28.     My investigation into this matter indicates RANDOLPH is associated with an Anchorage based "gang" identifying themselves as "PMM" (Players Making Moves). This particular group is comprised of 6-10 Anchorage based individuals responsible for various firearm related crimes and drug trafficking impacting the Anchorage community. The group was led by their recently arrested heroin and illicit pill trafficker, Samuel Frederick DAVIS. DAVIS is a former Anchorage resident who was operating from Nevada and employing RANDOLPH and other gang members to distribute his illicit substances in Anchorage. RANDOLPH's targeting of 3409 Northwood Drive appears to be in response to an on-going feud with a rival faction.

29.     At approximately 3:07 a.m., December 11th, 2020, RANDOLPH attempted to elude APD Officers (APD Case: 20-38879). A stolen Glock, Model: 29, 10mm pistol, Serial Number: RUT589 (ATF Item: 000039) and an **iPhone** (**ATF Item: 000068**) were seized from the vehicle. Submissions of ballistic evidence to the National Integrated Ballistics Information Network (NIBIN), ATF – National NIBIN Correlation and Training Center, generated a lead notification that presumptively indicated ATF Item: 000039 was utilized in the shooting at 3409 Northwood Drive on December 8th, 2020.

30.     On December 13th, 2020, I interviewed Kyin Andre SUMPTER-BOYD and James Najhar HUDSON. During these interviews SUMPTER-BOYD confirmed RANDOLPH's involvement in DAVIS' drug trafficking organization and involvement in the shooting incident on December 8th. HUDSON also confirmed RANDOLPH's involvement in the shooting, followed by the eluding on December 11th. HUDSON showed me a video recording on his cellular



telephone received from RANDOLPH. The video depicts RANDOLPH shooting at 3409 Northwood Drive. HUDSON went on to say he was contacted by RANDOLPH after he eluded Officers on December 11th. RANDOLPH told HUDSON he eluded Officers and he asked HUDSON to pick him up. HUDSON stated he did not comply with RANDOLPH's request.

31.     On December 15th, 2020, I petitioned for and received an arrest warrant for RANDOLPH and a search warrant for his residence located at 3803 Iowa Drive, #2. The arrest warrant was assigned number: 3AN-20-9734CR and the search warrant number: 3AN-20-4729SW. At approximately 10:10 a.m, December 18th, 2020, both warrants were executed by members of APD and ATF Agents. RANDOLPH was taken into custody and a prescription bottle (with no label) was seized from the front left pocket of his shorts. The prescription bottle contained assorted used packaging material and (10) green rectangular tablets with the imprint "S 90 3". These tablets appear to be fake Xanax, possibly containing the ingredient Fentanyl. RANDOLPH's gold in color iPhone (ATF Item: 000077) was located on the floor next to the air mattress in the living room where he was contacted. It too was seized and placed in airplane mode. Investigators located a loaded (5 cartridges) Ruger, Model: LCR, revolver, .357 caliber, under the air mattress where RANDOLPH was contacted. The revolver's position was consistent with having been placed under the mattress by RANDOLPH. These items of evidence were transported to ATF, pending potential additional charges.

## CONCLUSION

32. Based upon my training and experience, I know that pursuant to Title 21 U.S.C. §841(a) it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance. I also know that pursuant to Title 18 U.S.C. §924(c)(1)(A) it is unlawful for any person during and in relation to a drug trafficking crime to use or carry a firearm in furtherance of any such crime. I am also familiar with the State of Alaska weapons offenses violated by Jaheim James RANDOLPH.


33.   Based upon the aforementioned information, I believe that probable cause exists that the **Apple iPhone, seized and assigned ATF Item: 000068**, contains evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §924(c)(1)(A), Title 21 U.S.C. §841(a)(1), and State of Alaska weapons offenses.

34.   Based on the foregoing, your affiant is requesting that a search warrant be granted for the **Apple iPhone, seized and assigned ATF Item: 000068**, referenced in this affidavit (**Attachment A**) and there is probable cause to believe **Jaheim James RANDOLPH** is in violation of Title 18 U.S.C. §924(c)(1)(A), Title 21 U.S.C. §841(a)(1), and State of Alaska weapons offenses.

35. Specifically, I request authorization to search for, and seize, the items listed in **Attachment B**.

Respectfully submitted,

R. Allen Adair
Detective, Bureau of Alcohol, Tobacco, Firearms
and Explosives / Anchorage Police Department
Task Force

Subscribed  digitally and sworn telephonically
on February 9, 2021:

Matthew M. Scoble, United States Magistrate Judge